# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30100

OCCIDENTAL CHEMICAL CORPORATION,

United States Court of Appeals
Fifth Circuit

**FILED**

January 4, 2016

Lyle W. Cayce
Clerk

Plaintiff - Appellant

v.

LOUISIANA PUBLIC SERVICE COMMISSION; ERIC SKRMETTA, in his capacity as Commissioner; SCOTT ANGELLE, in his capacity as Commissioner; LAMBERT BOISSIERE, in his capacity as Commissioner; CLYDE C. HOLLOWAY, in his capacity as Commissioner; FOSTER L. CAMPBELL, in his capacity as Commissioner; ENTERGY LOUISIANA, L.L.C.,

Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana

Before DAVIS, BARKSDALE, and DENNIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The question presented in this appeal is whether the district court abused its discretion when it entered an order indefinitely staying this proceeding to allow the Federal Energy Regulatory Commission ("FERC") to act on an administrative complaint filed by Plaintiff-Appellant Occidental Chemical Corporation ("Occidental") against a non-party to this action, which largely concerns the same issues. The district court based its order on the primary jurisdiction doctrine, which is essentially a form of abstention. Under

No. 15-30100

this doctrine, a district court with subject matter jurisdiction may, under appropriate circumstances, defer to another forum, such as an administrative agency, which also has non-exclusive jurisdiction, based on its determination that the benefits of obtaining aid from that other forum outweigh the need for expeditious litigation.[1] Occidental essentially argues that the *indefinite* nature of the stay outweighs any potential benefit. For the reasons set forth, we agree.

## I.     BACKGROUND

The dispute arises under the Public Utility Regulatory Policies Act of 1978, Pub. L. No. 95-617, 92 Stat. 3117 ("PURPA"), which was originally passed in 1978 and was "designed to combat the nationwide energy crisis."[2] The Supreme Court has explained the relevant statute, § 210, as follows:

> Section 210 of PURPA's Title II, 92 Stat. 3144, 16 U.S.C. § 824a–3, seeks to encourage the development of cogeneration and small power production facilities. Congress believed that increased use of these sources of energy would reduce the demand for traditional fossil fuels. But it also felt that two problems impeded the development of nontraditional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy sources by state and federal utility authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development.
>
> In order to overcome the first of these perceived problems, § 210(a) directs FERC, in consultation with state regulatory authorities, to promulgate "such rules as it determines necessary to encourage cogeneration and small power production," including rules requiring utilities to offer to sell electricity to, and purchase electricity from, qualifying cogeneration and small power production facilities. Section 210(f), 16 U.S.C. § 824a–3(f), requires each state regulatory authority and nonregulated utility to

---

[1] *See Gulf States Utils. Co. v. Alabama Power Co.*, 824 F.2d 1465, 1472-73 (5th Cir. 1987), *amended*, 831 F.2d 557 (5th Cir. 1987).

[2] *FERC v. Mississippi*, 456 U.S. 742, 745 (1982).

implement FERC's rules. And § 210(h), 16 U.S.C. § 824a–3(h), authorizes FERC to enforce this requirement in federal court against any state authority or nonregulated utility; if FERC fails to act after request, any qualifying utility may bring suit.

To solve the second problem perceived by Congress, § 210(e), 16 U.S.C. § 824a–3(e), directs FERC to prescribe rules exempting the favored cogeneration and small power facilities from certain state and federal laws governing electricity utilities.

Pursuant to this statutory authorization, FERC has adopted regulations relating to purchases and sales of electricity to and from cogeneration and small power facilities. *See* 18 CFR pt. 292 (1980); 45 Fed. Reg. 12214–12237 (1980). These afford state regulatory authorities and nonregulated utilities latitude in determining the manner in which the regulations are to be implemented. Thus, a state commission may comply with the statutory requirements by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules. [3]

Occidental owns and operates a "qualifying facility" ("QF") under § 210, the so-called Taft Facility, located in Hahnville, Louisiana. Its traditional host utility is Defendant-Appellee Entergy Louisiana, LLC ("Entergy"), as well as other utilities regulated by Defendant-Appellee the Louisiana Public Service Commission ("LPSC"). Occidental claims that, under § 210(f)(1) of PURPA, 16 U.S.C. § 824a-3(f)(1), it has, among other rights, a right to compel Entergy to purchase the energy it produces, a right to effect such sales either through unscheduled "puts" of energy or through legally enforceable obligations, and a right to receive the appropriate rate for such sales.

Occidental claims that Entergy, to avoid its obligations to Occidental and other QFs under PURPA, decided in 2011 to join the Midcontinent Independent Transmission System Operator, Inc. ("MISO"), a regional

---

[3] *Id.* at 750-51 (footnotes omitted).

No. 15-30100

transmission organization. Occidental also claims that Entergy and MISO planned to integrate QFs, including the Taft Facility, into MISO, resulting in the QFs being wrongfully stripped of many PURPA rights.

On January 17, 2013, Occidental commenced an administrative action against MISO before FERC, in FERC Docket No. EL13-41-000, pursuant to the Federal Power Act, 16 U.S.C. §§ 824e and 825e (the "Integration Complaint"). Essentially, Occidental wants: (1) FERC to declare that MISO's plan to integrate QFs was invalid, and (2) FERC to order MISO to allow QFs to register for and participate in its markets without forgoing their PURPA rights. Resolving the Integration Complaint apparently will require FERC to determine how FERC's regulations applicable to QF transactions apply to the MISO marketplace, including the integration of QFs under the MISO tariff.

Although Occidental sought fast-track processing of the Integration Complaint, very little has happened in that proceeding. Briefing was completed in March 2013, and on March 6, 2014, FERC sent Occidental a letter ordering it to supplement the record with two pieces of information: "(a) Whether Occidental has registered as a market participant in MISO and, if so, how Occidental has participated as a market participant; and (b) Updates to Occidental's complaint to reflect experience regarding the treatment of its QF under MISO's Tariff, along with any supporting documents." Occidental did so on April 7, 2014, and other parties responded, but FERC has taken no further action to date.

In the meantime, on January 9, 2014, the LPSC entered an order granting an application by two Entergy entities. Occidental claims the order nominally concerned a modification of the methodology for calculating avoided costs but effectively adopted Entergy's plan for integrating the QFs into MISO, which both deprived QFs of their PURPA rights and essentially nullified a 2002 contract governing Entergy's purchase of energy from the Taft Facility.

No. 15-30100

In response to the LPSC's order, Occidental filed a FERC petition against the LPSC, under FERC Docket No. EL14-28-000 (the "LPSC FERC Complaint"). Occidental contended in the LPSC FERC Complaint that the LPSC's order "de-implements" PURPA protections in Louisiana "because it precludes qualifying facilities . . . from exercising their statutory rights under PURPA and [FERC's] regulations promulgated thereunder." Occidental asked FERC for injunctive relief against the LPSC in federal district court based on the LPSC's alleged failure to implement FERC's rules as required by § 210(f)(1), 16 U.S.C. § 824a-3(f)(1). Occidental claimed the LPSC's order violated PURPA in six specific ways, including: (1) it impaired QFs' rights under PURPA, and (2) the avoided cost methodology approved by the LPSC, which includes an adjustment for MISO-specific market charges, does not comply with PURPA and FERC's implementing regulations.

On April 4, 2014, FERC issued a notice of its intent not to act at this time. FERC noted that in the LPSC FERC Complaint, Occidental focused on the LPSC order's approval of Entergy's avoided cost methodology with respect to QFs. FERC also noted that the Integration Complaint against MISO already pending before FERC concerned "MISO's proposed treatment of QFs in the Entergy service territory upon Entergy's joining MISO" and that FERC had asked Occidental to supplement its pleadings in light of Entergy's actually joining MISO in December 2013. (Of course, as noted above, Occidental did supplement the pleadings as requested shortly thereafter.) FERC concluded:

> 3. We find that the petition for complaint and declaratory order in Docket No. EL13-41-000, while against MISO instead of the Louisiana Commission (the party Occidental seeks enforcement action against in this proceeding), largely raises the same issues as those raised in this proceeding and that these proceedings should be addressed at the same time.
>
> 4. Therefore, notice is hereby given that the Commission declines to initiate an enforcement action at this time pursuant to section

210(h)(2) of PURPA, as requested by Occidental. Our decision not to initiate an enforcement action at this time means that Occidental may itself bring an enforcement action against the Louisiana Commission in the appropriate court; the Commission's action here reserves its ability to issue a further order or to take further action at a future date should the Commission find that doing so is appropriate.[4]

Accordingly, Occidental filed the instant action in the Middle District of Louisiana against Entergy, the LPSC, and LPSC Commissioners in their official capacities. Against the LPSC defendants, Occidental's complaint essentially repeats the arguments set out in its LPSC FERC Complaint and further claims that the LPSC's order is preempted. Against Entergy, the complaint seeks declaratory relief and damages based on state-law claims for breach of the 2002 contract and the implied covenant of good faith and fair dealing. FERC has never exercised its right to intervene in the district court proceeding pursuant to § 210(h)(2)(B), 16 U.S.C. § 824a-3(h)(2)(B).

On June 4, 2014, Entergy and the LPSC defendants jointly moved the district court to stay the case pending an administrative determination in the Integration Complaint before FERC. The motion was extensively briefed by the defendants and by Occidental. In short, the defendants argued that the district court should exercise its discretion to stay the case pursuant to the primary jurisdiction doctrine because FERC's resolution of the Integration Complaint would also resolve one of the issues before the district court: whether MISO's plan to integrate the QFs complies with § 210 of PURPA and FERC's rules. In opposition, Occidental argued that the district court was barred from invoking the primary jurisdiction doctrine because § 210 alone coordinates the work between FERC and the district court, displacing the primary jurisdiction doctrine. Moreover, Occidental argued, even if the

---

[4] FERC's April 4, 2014 Notice.

doctrine applied, the costs of indefinitely delaying its PURPA suit would outweigh whatever benefits might flow from FERC's decision on the Integration Complaint.

After some further proceedings, irrelevant to this appeal, the district court granted the defendants' motion for a stay without a hearing on January 20, 2015, in a four-paragraph ruling. The district court, based on its consideration of the briefs and the applicable law, concluded that the case should be stayed pending a decision by FERC "on the issues relating to the [MISO] tariff and market rules which are underlying Plaintiff's claims before this Court." The court accurately set out the general law applicable to the primary jurisdiction doctrine and further noted: "To be clear, the Court acknowledges that Plaintiff's implementation claims must be decided by this Court under PURPA. However, the Court agrees with Defendants that a determination by FERC as to the MISO issues upon which Plaintiff's claims are based would be helpful to the Court." Accordingly, the court ordered that the matter be stayed pending FERC's resolution of the Integration Complaint and that the parties shall advise the court that the stay should be lifted within 14 days of a decision by FERC.

Occidental filed a timely motion for reconsideration along with a notice of appeal. The district court denied the motion for reconsideration, triggering this appeal. Both Occidental and the Defendants-Appellees raise the same arguments they raised before the district court, but we must first address the question of whether we even have appellate jurisdiction.

## II.    JURISDICTION

Occidental brings this appeal pursuant to 28 U.S.C. § 1291, relating to "final decisions" of the district court, and not under 28 U.S.C. § 1292, relating to interlocutory decisions. Because the district court did not dismiss the action

but "retained jurisdiction for a later disposition of the merits,"[5] the district court's stay order on its face does not appear final. Occidental points to a few purported exceptions to the final decision rule, including the argument that under *Hines v. D'Artois*,[6] the district court's order resulted in Occidental being "effectively out of court" and therefore functioned as a final decision.

The *Hines* plaintiffs, African-Americans who had allegedly been discriminated against by a police department, filed suit asserting claims under 42 U.S.C. §§ 1981 and 1983.[7] About one year into the suit, the district court disposed of a number of pretrial motions and sua sponte "ordered that the case would be stayed pending the filing by the plaintiffs of Title VII proceedings before the Equal Employment Opportunity Commission, and that plaintiffs would be required to 'carry their application for relief to final conclusion by the Commissioner before undertaking any further proceedings herein.'"[8] The plaintiffs attempted to appeal the order mandating a stay until they initiated and pursued to completion EEOC actions.[9] The initial question was whether the Fifth Circuit even had appellate jurisdiction over the superficially non-"final decision," and the court examined four potential routes to jurisdiction, including the "effectively out of court" exception to the "final decision" rule, which is based on the Supreme Court's decisions in *Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713 (1962), and *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949).[10]

The *Hines* court explained that in *Idlewild*, the district court had "denied a motion to convene a three-judge court and stayed the federal proceedings

---

[5] *Hines v. D'Artois*, 531 F.2d 726, 729 (5th Cir. 1976).

[6] *Id.*

[7] *Id.* at 728.

[8] *Id.*

[9] *Id.* at 729.

[10] 531 F.2d at 729-32.

until the state courts ruled on the central issue in the case," even though "[n]o state court litigation was then pending."[11] The case made its way to the Second Circuit and then to the Supreme Court, which explained:

> [T]he Court of Appeals properly rejected the argument that the order of the District Court "was not final and hence unappealable under 28 U.S.C. [§§] 1291, 1292," pointing out that "(a)ppellant was effectively out of court." 289 F.2d at 428.[12]

Thus, *Idlewild* is the origin of the "effectively out of court" rule, but as *Hines* explained, the rule is "reinforced by Supreme Court cases dealing more generally with the question of what district court orders are 'final,'" most notably *Cohen. Hines* quoted from a 1964 Supreme Court opinion summarizing the *Cohen* line of cases:

> [A] decision "final" within the meaning of s 1291 does not necessarily mean the last order possible to be made in a case . . . [.] And our cases long have recognized that whether a ruling is 'final' within the meaning of s 1291 is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and that it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the "twilight zone" of finality. Because of this difficulty this Court has held that the requirement of finality is to be given a "practical rather than a technical construction." . . . (i)n deciding the question of finality the most important competing considerations are 'the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.' (citations omitted)[13]

The *Hines* court noted that other circuits had applied the *Cohen* rationale to find appellate jurisdiction to review orders staying federal proceedings under the primary jurisdiction doctrine to allow federal agencies

---

[11] *Id.* at 730.

[12] *Id.* (quoting *Idlewild*, 370 U.S. at 715 n.2).

[13] *Id.* (quoting *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152-53 (1964) (alterations and omissions in *Hines*)).

to address the relevant issues.[14] Based on the *Idlewild* "effectively out of court" rationale and the more general reasoning of *Cohen*, the *Hines* court concluded that appellate jurisdiction existed, and its reasoning is instructive:

> In the circumstances of this case, we believe we are justified in treating the stay order entered below as a 'final' order for the purposes of § 1291. No EEOC complaint had been filed by any party in relation to this action when the district court entered its order staying the litigation pending completion of EEOC proceedings. We noted in 1972 that 'it takes the EEOC a minimum of eighteen months to two years to process a charge of discrimination,' *Chromcraft Corp. v. EEOC*, 5 Cir. 1972, 465 F.2d 745, 747. The uncontradicted affidavit of plaintiffs' counsel, presented to the district court in support of a motion to modify order, attested to his experience that the length of time the New Orleans EEOC office (where this complaint would be heard) has taken to investigate and attempt reconciliation of discrimination charges was 1 1/2 to 5 1/2 years. The EEOC, in its amicus brief in this case, makes the following uncontested statement:
>
>> As of December, 1974, there were 2,195 charges pending in the Commission's New Orleans District Office, with 215 new charges filed each month. The average period of time elapsing between the filing of a charge until conciliation is attempted is 40.2 months.
>
> Whatever the absolute judicial validity of the above sources of information, it seems beyond cavil that the effect of the stay order in this case was to put plaintiffs "effectively out of court," see [*Idlewild*], *supra*, for a protracted and indefinite period—at least eighteen months, and possibly much longer. For the purposes of expedition and certainty, the parties here would have been served just as well by a stay pending the arrival of Godot.[15]

Thus, the primary focus of *Hines* is the length of time it might take for an administrative agency to reach a decision, with 18 months deemed

---

[14] *Id.* at 731 (citing *C. A. B. v. Aeromatic Travel Corp.*, 489 F.2d 251 (2d Cir. 1973) (Civil Aeronautics Board), and *Ringsby Truck Lines, Inc. v. United States*, 490 F.2d 620 (10th Cir. 1973) (Interstate Commerce Commission)).

[15] *Id.* at 731-32 (footnotes omitted).

sufficient to constitute effectively putting the plaintiffs out of court under *Idlewild*. In the instant case, Occidental filed its Integration Complaint with FERC in January of 2013, and the only action it has taken to date was ordering Occidental to supplement the record, which Occidental timely did in April of 2014. FERC has taken no action since the district court entered the stay order in this case, and there is no indication of when FERC might do so. Thus, it has already been nearly two years without FERC action and might take substantially longer, as all parties acknowledged at oral argument in this case. Under the rationale of *Hines*, it is reasonable to conclude that the district court's stay order effectively put Occidental out of court and therefore gives this court appellate jurisdiction to review the order.

Thus, if *Hines* remains good law, it appears we have appellate jurisdiction. The standard for overturning *Hines* is quite high:

> Because a previous panel has resolved this question, we cannot overturn its decision "absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court or by our *en banc* court." In particular, for a Supreme Court decision to change our Circuit's law, it "must be more than merely illuminating with respect to the case before [the court]" and must "unequivocally" overrule prior precedent.[16]

The LPSC and Entergy argue that *Hines* has been effectively overruled by the Supreme Court's decision in *Moses H. Cone*,[17] which they argue limited the "effectively out of court" exception under *Idlewild/Cohen* to situations in which the stay operates in favor of a *state* forum. We must reject that argument. First, *Moses H. Cone* does not limit the *Idlewild/Cohen* rule on its face. Although *Moses H. Cone* applied the rule in the context of a stay order deferring federal action in favor of state proceedings, it did so because those

---

[16] *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (citations omitted).

[17] *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1 (1983).

11

were the facts before it, and the opinion on its face does not limit the rule to only those circumstances.[18]

Second, and more important, the Supreme Court cited *Hines* with approval along with other appellate cases applying the "effectively out of court" rule. After discussing *Idlewild*, the Court explained:

> Here, the argument for finality of the District Court's order is even clearer. A district court stay pursuant to *Pullman* abstention is entered with the expectation that the federal litigation will resume in the event that the plaintiff does not obtain relief in state court on state-law grounds. Here, by contrast, the District Court predicated its stay order on its conclusion that the federal and state actions involved "the identical issue of arbitrability of the claims of Mercury Construction Corp. against the Moses H. Cone Memorial Hospital." That issue of arbitrability was the only substantive issue present in the federal suit. Hence, a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; the state court's judgment on the issue would be res judicata. Thus, here, even more surely than in *Idlewild*, Mercury was "effectively out of court." **Hence, as the Court of Appeals held, this stay order amounts to a dismissal of the suit.**[19]

In a footnote to that final sentence, the Court cited *Hines* with approval without limiting its application.[20] Although the same footnote also contains ambiguous language suggesting the *Idlewild/Cohen* rule might be limited to deferrals in favor of a state forum,[21] it is impossible for us to say that the decision "unequivocally" overrules *Hines* given its approving citation to *Hines* in a key passage. For this reason, although some later opinions have called

---

[18] *See generally id.*, 460 U.S. at 8-13 (addressing appellate jurisdiction).

[19] *Id.* at 10 (citations omitted, emphasis added).

[20] *Id.* at 10 n.11.

[21] After citing *Hines* with approval, the Court stated that "*Idlewild*'s reasoning is limited to cases where (under *Colorado River*, abstention, or a closely similar doctrine) the object of the stay is to require all or an essential part of the federal suit to be litigated in a state forum." *Id.* Of course, the focus on state deferrals in this sentence may have been prompted by the facts of *Moses H. Cone*, which concerned a state deferral.

No. 15-30100

*Hines*'s validity into question, no controlling opinion has concluded it has been overruled,[22] and one opinion expressly concluded it remains good law: "We furthermore note that the Supreme Court itself cited *Hines* with approval in [*Moses H. Cone*], thus making clear its view that the two cases are reconcilable."[23]

In short, we conclude *Hines* remains good law following *Moses H. Cone*, and this case is sufficiently close to the facts of *Hines* to give us appellate jurisdiction under the "effectively out of court" rule. Because we possess appellate jurisdiction under *Hines*, we decline to address Occidental's alternative arguments that we possess jurisdiction under the collateral order doctrine or that we should treat this purported appeal as a petition for writ of mandamus.

## III.  PRIMARY JURISDICTION DOCTRINE

### A.    Standard of Review

"The doctrine of primary jurisdiction . . . is a doctrine of judicial abstention whereby a court which has jurisdiction over a matter, nonetheless defers to an administrative agency for an initial decision on questions of fact or law within the peculiar competence of the agency."[24] "We review an abstention ruling for abuse of discretion, but 'we review *de novo* whether the

---

[22] *See Dresser v. Ohio Hempery Inc.*, 122 F. App'x 749, 753 (5th Cir. 2004) ("Although *Hines* has never been overturned, subsequent case law has made its precedential value questionable."). *Dresser* discussed *Kershaw v. Shalala*, 9 F.3d 11, 14 (5th Cir. 1993), an opinion which interpreted *Moses H. Cone* to apply only to deferrals to state courts, not federal agencies, based on the above quoted language from footnote 11 of the opinion. *Kershaw* did not cite *Hines*, much less address why the Supreme Court cited it with approval if it intended to overrule it.

[23] *United States v. Garner*, 749 F.2d 281, 288 n.8 (5th Cir. 1985), *supplemented*, 752 F.2d 116 (5th Cir. 1985).

[24] *REO Indus., Inc. v. Natural Gas Pipeline Co. of Am.*, 932 F.2d 447, 456 (5th Cir. 1991) (emphasis omitted).

requirements of a particular abstention doctrine are satisfied."[25] "A district court by definition abuses its discretion when it makes an error of law."[26]

## B.    Relevant Law

"'No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.'"[27]

> It is well established that courts need not refer an issue to an agency when the issue is strictly a legal one, involving neither the agency's particular expertise nor its fact finding prowess; the standards to be applied in resolving the issue are within the conventional competence of the courts and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of the case. Furthermore, the
>
> > courts should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants where the nature of the action deems the application of the doctrine inappropriate. . . . Likewise, when the agency's position is sufficiently clear or nontechnical or when the issue is peripheral to the main litigation, courts should be very reluctant to refer. . . . Finally, the court must always balance the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible.

---

[25] *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014) (quoting *Romano v. Greenstein*, 721 F.3d 373, 380 (5th Cir. 2013)). *See also Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199, 200 (5th Cir. 1988) (applying abuse of discretion standard to district court order applying primary jurisdiction doctrine).

[26] *Koon v. United States*, 518 U.S. 81, 100 (1996) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

[27] *Columbia Gas Transmission Corp. v. Allied Chem. Corp.*, 652 F.2d 503, 520 n.15 (5th Cir. 1981) (quoting *United States v. W. Pac. R.R.*, 352 U.S. 59, 64 (1956)).

No. 15-30100

*Mississippi Power & Light*, 532 F.2d at 419 [(5th Cir. 1976)]. *See also Shew v. Southland Corp.*, 370 F.2d 376, 379-80 (5th Cir. 1966) (agency position clear).[28]

In *Columbia Gas Transmission*, the Fifth Circuit held that only a fact-intensive enforcement issue should be referred to FERC, while the district court must retain jurisdiction of "nonenforcement regulatory issues" which were "legal and not factual in nature."[29]

In *Mississippi Power & Light*, we listed some other circumstances where the doctrine generally is not warranted, including (1) "[i]f, under no conceivable set of facts, the agency could immunize what would be a clear violation of federal law"; "where the litigation deals with a single event which requires no continuing supervision by the regulatory agency"; or "where Congress has determined by statute that the courts should decide the issue in the first instance, primary jurisdiction should not be invoked" (citing *Mercury Motor Express v. Brinke*, 475 F.2d 1086 (5th Cir. 1973), discussed in the next section).[30] Although primary jurisdiction is most appropriate for fact-intensive questions within the agency's jurisdiction, we have explained that it is sometimes appropriate to refer questions of law to an agency.[31]

Thus, at a general level, the primary jurisdiction doctrine requires the district court to balance the assistance potentially provided by an agency's specialized expertise against the litigants' certainty of delay.

---

[28] *Id.* (citations omitted).

[29] *Id.*

[30] 532 F.2d at 419.

[31] *See J. M. Huber Corp. v. Denman*, 367 F.2d 104, 111-12 (5th Cir. 1966) ("But considering the broad aim of this device and the consequent flexibility of it there is really nothing startling about submitting to an agency for initial decision the question of its own jurisdiction. That this ultimately is a question of law, probably one of statutory construction, is not fatal." (footnote omitted)).

No. 15-30100

## C.  *Mercury Motor* **Does Not Preclude Application Of The Primary Jurisdiction Doctrine In This Case.**

Occidental's primary argument is that, under *Mercury Motor*, the primary jurisdiction doctrine is not available for actions under § 210 of PURPA because Congress has already coordinated work between FERC and the district court. Thus, Occidental argues, the district court abused its discretion because it erred as a matter of law. Occidental's reading of *Mercury Motor* is overly broad. The case does not apply to preclude the primary jurisdiction doctrine here.

In *Mercury Motor*, the plaintiffs, eight licensed freight forwarders, sought injunctive relief against defendant Brinke to prevent him from operating as a freight forwarder without a permit from the Interstate Commerce Commission ("ICC").[32] The district court not only denied preliminary injunctive relief but "stayed further proceedings pending final action by the ICC on Brinke's freight forwarder permit application."[33] On appeal to the Fifth Circuit, the panel, after determining that it had jurisdiction, noted that the plaintiffs had not sued under common law or a statute only tangentially related to the Interstate Commerce Act but

> under a section of the Act itself—§ 417(b)(2), 49 U.S.C.A. § 1017(b)(2). Further, **the statute itself is not silent on the problem of coordinating the work of the district courts and the ICC in this type of action**, but makes express provision for coordination. Section 1017(b)(2) provides, "The Commission may appear as of right in any such action," and Section 1017(b)(3) explicitly gives the ICC the power to assert primary jurisdiction in an appropriate case . . .

> The statute thus gives the ICC power to effect a stay of a § 1017(b)(2) action, but conspicuously omits mention of any corresponding power in the district court when the ICC does not

---

[32] 475 F.2d at 1088.
[33] *Id.*

intervene. We think the conferring of power to stay only on the Commission in this thoughtfully designed procedural provision, enacted as an integral part of the regulatory legislation, strongly suggests that Congress intended to supersede and replace the judicial primary jurisdiction doctrine in § 1017(b)(2) suits.[34]

Occidental focuses on the bolded language above and seems to suggest, in essence, that virtually any statute coordinating work between an agency and federal courts is sufficient to preclude the primary jurisdiction doctrine. That is plainly not what *Mercury Motor* held. Instead, the panel looked to the specific language of the relevant statute and concluded that it actually barred the district court from staying the proceeding.[35] There is no such bar in § 210 of PURPA, 16 U.S.C. § 824a-3.

The relevant section, § 210(h)(2) ("Commission enforcement"), provides, in relevant part:

> (2)(A) The Commission may enforce the requirements of subsection (f) of this section against any State regulatory authority or nonregulated electric utility. . . .
>
> (B) Any electric utility, qualifying cogenerator, or qualifying small power producer may petition the Commission to enforce the requirements of subsection (f) of this section as provided in subparagraph (A) of this paragraph. If the Commission does not initiate an enforcement action under subparagraph (A) against a State regulatory authority or nonregulated electric utility within 60 days following the date on which a petition is filed under this subparagraph with respect to such authority, the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority or nonregulated electric utility to comply with such requirements, and such court may issue such injunctive or other relief as may be appropriate. The

---

[34] *Id*. at 1093 (footnote omitted, emphasis added).

[35] The cases from other jurisdictions cited by Occidental in its brief also tend to concern specific restrictions.

Commission may intervene as a matter of right in any such action.[36]

The statute allows FERC to enforce § 210(f) itself, or an appropriate private party may petition FERC to enforce § 210(f). If FERC fails to do so, then the private party may file an action in the district court, which FERC may intervene in, but FERC is not required to do so. Although § 210(h)(2) indeed coordinates work between the agency and the federal courts, it says nothing about the power to stay, and it does not otherwise expressly or impliedly preclude application of the primary jurisdiction. Thus, *Mercury Motor* is easily distinguishable, and it does not apply to preclude the district court from applying the primary jurisdiction doctrine in this suit under § 210 of PURPA.

## D.     The District Court's Order Should Be Revised To Avoid An Indefinite Stay.

Occidental argues in the alternative that if the doctrine could apply, the district court abused its discretion by not considering and weighing all the factors set out above. Occidental's primary objection is that the district court did not engage in the required analysis. While the district court's order is certainly very short, the law, as set out in Part III.B above, appears only to require the district court to consider and weigh the relevant factors, not explain them in any particular form.

Occidental has not demonstrated any material error in the district court's statement of the applicable law, short though it may be. The closest Occidental comes is in claiming that "the district court stayed this entire case without analyzing, or even acknowledging, Occidental's state-law claims against Entergy," which generally should not be stayed pursuant to the primary jurisdiction doctrine. The district court's "failure" is not surprising

---

[36] 16 U.S.C. § 824a-3(h)(2).

because Occidental failed to bring that issue to the district court's attention in its opposition to the LPSC's and Entergy's motion to stay. Accordingly, Occidental has waived that issue on appeal.

As to the issues before the district court, the district court noted that to apply the primary jurisdiction doctrine, it "must weigh the benefits of obtaining the agency's aid against the need to resolve the litigation expeditiously and may defer only if the benefits of agency review exceed the costs imposed on the parties." Having considered the briefs of the parties (including, presumably, the more than 1,000 pages of exhibits attached to the motion to stay by the LPSC and Entergy), the district court concluded that "a determination by FERC as to the MISO issues upon which Plaintiff's claims are based would be helpful to the Court."

It is worth noting that Occidental apparently is *not* challenging the positive side of the balancing test. Given that Occidental itself sought a FERC determination, first in the Integration Complaint and later in the LPSC FERC Proceeding, it is not surprising that Occidental does not dispute the potential benefit of a FERC determination. Instead, Occidental attacks the negative side of the balancing test, the indefinite delay in litigation. Occidental does not argue that *some* delay is unwarranted, only that an indefinite delay is. FERC has no deadline to act, and Occidental is stuck until that time.

In *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199 (5th Cir. 1988), the Fifth Circuit confronted a similar problem and arrived at a sensible solution. There, the district court had dismissed the plaintiff's suit against a pipeline pursuant to the primary jurisdiction doctrine, concluding that FERC was in a better position to determine the issues presented, which related to a take-or-pay clause in a natural gas purchase contract.[37] On appeal, the panel

---

[37] 837 F.2d at 200.

determined that appellate jurisdiction existed and then moved on to the primary jurisdiction doctrine. In connection with that analysis, the panel spent some time discussing FERC's past inaction on similar claims, but it also found that some recent developments indicated FERC might be newly willing to act on such claims.[38] Thus, the court found, FERC's possible inaction was not sufficient to preclude the primary jurisdiction doctrine.

Based on the other factors discussed, it appeared the panel was prepared to affirm the district court's dismissal order in full under the abuse of discretion standard, but it instead directed the district court to modify its order to avoid an indefinite delay:

> Finally, Wagner & Brown contends that the district court improperly deferred to FERC's primary jurisdiction because the delay which will likely attend resolution of ANR's claims will needlessly tie up payments owing to Wagner & Brown under the contract and will imperil Wagner & Brown financially. Wagner & Brown cannot seek redress elsewhere while waiting for FERC to act because the dismissal order and the determination of primary jurisdiction bar Wagner & Brown from pursuing its claims in another forum.
>
> Wagner & Brown's argument is persuasive. If the district court is allowed to decline jurisdiction, and FERC's past inaction on this issue continues, any recovery of damages from ANR could be so delayed as to be ineffective even if Wagner & Brown's rights are eventually established. Yet, the doctrine of primary jurisdiction clearly indicates that the parties should seek the expertise of FERC. These aims are not necessarily incompatible. **To ensure that Wagner & Brown's rights will not be unreasonably delayed or lost, we direct that the district court modify its judgment by vacating its order of dismissal and substituting an order staying proceedings before it for a period of 180 days to afford FERC an opportunity to rule on ANR's complaint. If no such ruling is forthcoming within that time, or such extension thereof as the district court is**

---

[38] *Id.* at 204-05.

**persuaded would not irreparably harm Wagner & Brown's rights and is required for good cause shown by FERC, then the district court should proceed to adjudicate the rights of the parties without further deference to the expertise of FERC.**[39]

Given that all parties agree it could take years for FERC to resolve the Integration Complaint, we conclude that the same solution is appropriate for this case. A deadline will give FERC a reasonable opportunity to act on the Integration Complaint without the costs inherent in an indefinite delay. Accordingly, this action will be remanded to the district court with appropriate instructions.

## IV. CONCLUSION

For the reasons set out above, we VACATE the district court's stay order and REMAND to the district court to enter an order staying the proceedings before it for a period of 180 days to allow FERC the opportunity to rule on the Integration Complaint. If FERC fails to act within that 180 day period, then the district court may extend the deadline if (1) FERC shows good cause, and (2) the delay would not irreparably harm Occidental's rights. Otherwise, the district court should proceed to adjudicate the rights of the parties without further deference to the expertise of FERC.

---

[39] *Id.* at 206 (citations omitted, emphasis added).